*S. Judah*, for the appellant.

---

## DUKES v. THE STATE.

Indictment for murder in the second degree. The second count did not aver that the homicide was committed with premeditated malice, or in the perpetration or attempt to perpetrate a rape, or arson, &c.; nor did it allege that the homicide was maliciously perpetrated, but on the contrary it stated that it was committed without malice; nor did it aver that the killing was upon a sudden heat, or in the commission of an unlawful act. *Held*, that no indictable homicide was charged.

The first count of the indictment in this case is held to be good. *Vide infra.*

If the name of the defendant appears in the body of an indictment, the omission to name him in the title, is a defect which cannot tend to prejudice his rights upon the merits.

In an indictment for a homicide by shooting, the kind of gun and the shot used need not be specified; nor need the wound be described.

An indictment containing one good paragraph, should not be quashed.

The judgment, on conviction, will be given on the good count.

Upon a paragraph for murder, the defendant may be convicted of manslaughter.

The signature of the prosecuting attorney is not essential to the validity of an indictment.

The Court possesses the power to appoint an attorney of the Court, when necessary to prevent a failure of justice, to conduct the prosecution of a criminal.

A judge of the Court of Common Pleas may sit for the Circuit judge in a particular case in which the latter is incompetent, without exercising the functions of two offices.

Where the indictment charged that the deceased came to his death by the discharge of a gun loaded with leaden shot, which shot entered his abdomen, &c., *held*, that evidence as to the wounds was admissible.

The defendant in such indictment could not be allowed to prove his own account of the act, given a short time after it occurred; and any statement of his, to be admissible in evidence for him, must have been a part of the *res gesta*.

Nov. Term,
1858.

Dukes
v.
The State.

Where the question arises whether the accused, in the commission of a homi-
cide, acted upon grounds that justified him in the deed, it would *seem* that
the character of the deceased might be a circumstance to be considered,
especially where the accused knew his character, and knew *him* at the time
he committed the act.

But, *it seems*, that where these facts may not have been known, the evidence
would be entitled to little weight.

In justifying a homicide in defense of personal property, &c., the defendant
may give in evidence any facts tending to show the character of the attack
which he resisted, the intention with which it was made, and that he had
reasonable grounds to believe that it was necessary to go to the extent he
did in resisting it.

Wednesday,
March 14,
1859.

APPEAL from the *Clinton* Circuit Court.

PERKINS, J.—Indictment, of which a copy follows:

"The state of *Indiana, Clinton* county. In the *Clinton*
Circuit Court, *October* term, 1858.

1. "The grand jurors for the county of *Clinton*, in the
state of *Indiana*, upon their oath, charge that *Samuel
Dukes*, late of said county, on the twenty-first day of *July*,
in the year of our Lord one thousand eight hundred and
fifty-eight, at the county aforesaid, feloniously, purposely,
and maliciously, but without premeditation, did kill and
murder *John G. White*, a human being, by then and there
feloniously, purposely, and maliciously, but without pre-
meditation, shooting the said *John G. White* in the abdo-
men with a certain gun, loaded and charged with gun-
powder and leaden shot, which gun, he, the said *Samuel
Dukes*, in his hands then and there had and held, and
discharged, and shot off, at and against the said *John G.
White*. And so the jurors aforesaid, upon their oaths
aforesaid, do find and say that the said *Samuel Dukes* did,
feloniously, purposely, and maliciously, but without pre-
meditation, kill and murder the said *John G. White*, on the
day and year last aforesaid at the county aforesaid."

2. "And the said jurors in and for the county aforesaid,
upon their oaths do further charge that *Samuel Dukes*, late
of said county, on the twenty-first day of *July*, in the year
of our Lord one thousand eight hundred and fifty-eight,
at the county of *Clinton* aforesaid, did feloniously and un-
lawfully, without malice, kill and murder *John G. White*, a
human being, voluntarily, by then and there feloniously

and unlawfully, without malice, shooting the said *John G.*
*White,* voluntarily, in the abdomen, with a certain gun
loaded and charged with gunpowder and leaden shot,
which gun, he, the said *Samuel Dukes,* in his hands then
and there had and held, and discharged, and shot off at
and against the said *John G. White.* And so the jurors
aforesaid, upon their oaths aforesaid, do find and say that
the said *Samuel Dukes* did feloniously and unlawfully, but
without malice, kill and murder the said *John G. White,*
voluntarily, on the day and year last aforesaid, against the
peace and dignity of the state of *Indiana.*

     *James F. Suit,* prosecuting attorney."

Indorsed—"A true bill. *Samuel B. Thompson,* foreman.
Witnesses: *Jeremiah H. Blacker, William H. Truelock."*

A motion to quash the indictment was overruled.

The defendant pleaded not guilty, and excepted to the
jurisdiction of the Court. The exception was overruled.
The trial followed. The defendant was convicted of man-
slaughter, and his punishment fixed at fifteen years' im-
prisonment in the state prison.

A motion for a new trial was overruled, and sentence
passed.

The defendant appealed to the Supreme Court; and his
cause has been ably presented here by his counsel. We
proceed to its examination and decision.

*First.* Of objections to the indictment.

It is an indictment for murder in the second degree, and
contains two counts.

The second may be laid out of the case at once, as a
discussion of its allegations would needlessly encumber
the opinion in the cause. It does not properly charge any
indictable homicide—not murder in the first degree, be-
cause it does not aver that the homicide was committed
with premeditated malice, or in the perpetration, or at-
tempt to perpetrate, any rape, arson, &c.—not murder in
the second degree, because it fails to allege that the homi-
cide was maliciously perpetrated, but, on the contrary, ex-
pressly states that it was committed without malice—not
manslaughter, because it does not aver that the killing

was upon a sudden heat, or in the commission of an unlawful act. It charges an act mentally, morally, and legally impossible to be performed by a "person of sound mind," viz., the voluntarily, without malice, in the absence of passion or excitement, and in no attempt to commit any unlawful act, unlawfully killing a human being.

Three objections are taken to the first count:

1. The defendant is not named in the title prefixed to it.

2. The kind of gun used, and of shot with which it was charged, are not specified.

3. It is not averred that a wound was inflicted of which the defendant died.

1. The first subdivision of § 54, 2 R. S. p. 367, requires that an indictment shall have a title, in which the names of the defendant, and the Court to which it is presented, shall be stated; but § 60, p. 368, of the same volume, enacts that an indictment shall be sufficient, as to description of the person, if the defendant is named in it, &c., and § 61, provides that no indictment shall be quashed for any defect which does not tend to prejudice the substantial rights of the defendant upon the merits. We think the omission of the mere formality of naming the defendant in the title, in an indictment which does name him in the body of it, is a defect not tending to prejudice his rights upon the merits.

2. As to the description of the gun and shot.

There were, for centuries, in *England*, reasons requiring particularity of description in indictments for crimes, especially that of murder, which never had an existence here. For example: The weapon with which the killing was effected was a deodand (*Deo dandum*, given to God), and was forfeited to the king; by whom it was usually applied to pious uses. Hence, it became necessary to particularly describe it in the indictment, as a means of its identification; and, says the Crown Circuit Companion, p. 439, "If the weapon be of no value, it should be so expressed; for the township shall be charged for its value, &c., if delivered to them. 2 H. H. 185." And, if it be of any value, its value should be stated. *Id.* 441.

Again: The clergy were not punishable by the civil magistrate for crimes. And if indicted and convicted therefor, they interposed the claim of clerical privilege, and were discharged without punishment. 4 Blacks. Comm. 333, 365. This privilege, or benefit of clergy, was afterwards extended to all who could read. *Id.* 367. It became, through the advancement and diffusion of knowledge, an enormous abuse, and laws were enacted restricting the privilege.

It was taken away from those who willfully, and of malice aforethought, *murdered* a human being. Hence, it became necessary, in an indictment for such murder, to use the words of the statute, in order to show that the defendant was not entitled to claim the benefit of clergy if convicted. *Anderson* v. *The State*, 5 Ark. R. 445.

Quoting again from the Crown Circuit Companion, p. 443: "By stat. 1, Jac. 1, c. 8, intituled an act to take away the benefit of clergy from some kind of manslaughter, it is enacted, § 2, that every person and persons which shall stab or thrust any person or persons that hath not then any weapon drawn, &c., so as the person or persons so stabbed or thrust shall thereof die within the space of six months then next following, although it cannot be proved that the same was done of malice aforethought, yet the party so offending, and being thereof convicted, &c., shall be excluded from the benefit of clergy," &c.

" The words of the statute are, stab and thrust. * * * The indictment, to put the prisoner from his clergy, must be specifically formed pursuant to the statute, viz., that he did with a sword, &c., stab the party dead, he having no weapon, &c., otherwise it will be but common manslaughter, and the party will have his clergy."

The reasons, as we have said, for this particularity of description, never had an existence in this state, and from changes in the law, they have ceased to exist in *England*. Benefit of clergy, &c., have been abolished there. And with the cessation of the reason there, the practice has been permitted to cease by positive law.

" The statute 14 and 15 Vict. c. 100, provides that in an

indictment for murder or manslaughter, it shall not be necessary to set forth *the manner in which*, or the *means* by which the death of the deceased was caused; but it shall be sufficient in every indictment for murder to charge that the defendant did feloniously, willfully, and of malice aforethought, kill and murder the deceased; and it shall be sufficient in every indictment for manslaughter to charge that the defendant did feloniously kill and slay the deceased." Wat. Archb., Pref., 12.

Our statute is, perhaps, as liberal in regard to criminal pleadings as the *English;* but this we do not decide. 2 R. S. p. 368, § 60. It even dispenses with the rule which, we have seen above, has been, at all times, the controlling one in *England*, viz., that the indictment must closely pursue the language of the statute. Section 59, 2 R. S. p. 368, enacts that, " Words used in the statute to define a public offense, need not be strictly pursued, but other words, conveying the same meaning, may be used." Our statute clearly requires no greater certainty in criminal than in civil pleading. 2 R. S. pp. 37, 367.

3. What we have said on the second objection, answers that as to the description of the wound.

We think the first paragraph in the indictment sufficient. An indictment containing one good paragraph, should not be quashed. *The State* v. *Staker*, 3 Ind. R. 570. The judgment, upon conviction, will be given on that. Wat. Archb. 93. And, upon the paragraph for murder, the defendant could be convicted of manslaughter. *Lumm* v. *The State*, 3 Ind. R. 293.—*Moon* v. *The State, id.* 438.— *Wright* v. *The State*, 5 *id.* 527.—2 R. S. p. 376, § 110.

It is further objected, that the indictment was not signed by the prosecuting attorney. It is admitted that the indictment was signed by *James F. Suit*, as prosecuting attorney; but it appears that he was a special prosecutor for the case, and not the prosecutor elected by the people, nor was he the prosecutor appointed to serve, in all cases, for the term of the Court at which he acted in this case. It is contended that his appointment as such special prosecutor was void; and, hence, that there was no prosecutor in

the case. The facts are, that, owing to the failure in attendance of the elected prosecuting attorney, the Court appointed, for the term, L. McClurg, Esq., in his stead. See 2 R. S. 386, § 5. McClurg had been retained by Dukes as counsel, and, hence, could not prosecute in his case. The Court, for this reason, appointed specially to discharge that duty, Mr. Suit.

Indictments are found and returned by the grand jury. The prosecuting attorney acts as their adviser, and may as their scribe; and it is proper that he should sign indictments. The law makes it his duty to do so. But we do not think his signature essential to the validity of the indictment. His failure to sign it would not vitiate an indictment duly returned and authenticated by the grand jury. And we think the Court possesses an inherent power to appoint one of the attorneys of the Court, when necessary to prevent a failure of justice, to conduct the prosecution of a criminal.

Objection was made in the Circuit Court to the competency of the judge sitting at the trial. He was the judge of the Court of Common Pleas, for the district composed of the counties of Carroll and Clinton. He had been designated by the circuit judge, to preside during the trial, the competency of the circuit judge having been excepted to.

The objection is that the Common Pleas judge was thus holding two offices, in contravention of the constitution. We do not think the case fully within the constitutional prohibition. The permission given to the Common Pleas judge to sit for a circuit judge, in a particular case in which the latter is incompetent, does not, in our opinion, vest in the former the two offices of judge of the Circuit Court and of the Common Pleas. The office of circuit judge was not vacant, and, of course, the person presiding at this trial did not and could not, by such mode, get into it. Nor could there be two circuit judges, in the same circuit, at one and the same time. See Case v. The State, 5 Ind. R. 1.

The remaining points to be considered are made upon

the admission and refusal to admit, evidence, and upon the giving and refusing to give instructions.

The Court permitted testimony to go to the jury, as to the wounds upon the body of the deceased. It was objected that the indictment contained no description of any wounds, and, hence, that no proof could be made on the point.

We think the evidence was rightly admitted. The indictment averred that the deceased came to his death by the discharge of a gun, loaded with leaden shot, which shot entered his abdomen, &c. It was legitimate to prove that averment by evidence of facts establishing its truth. The evidence might be circumstantial. It is a general rule that pleadings need not recite the evidence going to prove their truth. It has even been held, that if the indictment aver the death to have been caused by the use of one kind of poison, it may be proved to have been caused by another. *Carter* v. *The State*, 2 Ind. R. 617.

A witness for the state testified that at a certain time, which would appear to be in the night, after *White* had been shot, and before he expired, but how long after the shooting does not appear, he heard *Dukes* "call to Dr. *Milburn*, and ask him to come there to him;" the defendant then asked the witness to state all that *Dukes* said at that time; the state objected, and the Court sustained the objection.

The bill of exceptions, as to this point, does not present a case in which we can say any error has occurred, or injury been done to the appellant. So far as appears, the only object of proving the fact that *Dukes* was heard to call to Dr. *Milburn*, may have been to show the presence of *Dukes* at a particular place. No statement of his as to the wounding of *White* was called for or given, and the bill does not show that he ever made any, or said anything beyond merely making the call testified to. Nor could it have been allowed to the defense to prove his account of the transaction, given even a short time after it had taken place. The statement, to have made it admissible, must have been a part of the *res gesta*. *Bland* v. *The State*,

2 Ind. R. 608.—Ind. Dig. 383. It might have been permitted to the state to give evidence of admissions made by the defendant at any time.

The state was permitted to give evidence of the character of the deceased, *White.*

As a general rule, it is the character of the living—the defendant on trial for the commission of crime—and not of the person on whom the crime was committed, that is in issue, and as to which, therefore, that evidence is admissible. But, in a case like the present, where the question arises whether the accused acted, in the commission of a homicide, upon grounds that justify him in the deed, it would seem that the character of the deceased might be a circumstance to be taken into consideration. Especially might this be the case, where the accused knew that character, and also knew, at the time, the individual by whom the attack upon him or his property was made. See 3 Greenl. Ev. pp. 27, 28, and note.

Where, as in this case, these facts may not have been known, we do not see how the evidence could be entitled to much weight.

Some other evidence was offered and rejected, to which rejection the defendant excepted. A brief statement of the facts of the case will aid in understanding the bearing upon it of these rulings of the Court.

On the night of the 20th and 21st of *July,* 1858, at about 2 o'clock, *Samuel Dukes,* the appellant, was aroused from sleep and his bed by noises about his dwelling. Rumors of a threatened attack upon it had previously reached him. It was a house of but one story and three rooms, with a porch. In the back room was an unopened barrel of whisky. Getting up from his bed, he attempted to open the door of his room and go out, but found it fastened upon the other side so that it could not be opened. He then got his gun, raised the window, and discerning from it, upon the porch, some object, the character of which, owing to the darkness, he could not determine, he aimed his musket at it and fired. The object disappeared; *Dukes* went to work, forced open his door, and got out. He found that

Nov. Term,
1858.

DUKES
v.
THE STATE.

the back room had been broken open, entered, and the head of the whisky barrel knocked in with an ax; and that the doors leading out of the other two rooms of the house, in which the family of *Dukes* were, had been fastened with ropes to prevent their egress from the house or entrance into the back room which was broken open.   Soon afterwards, intelligence came to *Dukes* that the unknown object upon his porch, at which he had aimed his musket, was *John G. White;* that the charge of shot with which it was loaded had entered his abdomen, and that he was mortally wounded.   *White*, on being wounded, had hastened to his lodgings, informed his bed-fellow that *Sam. Dukes* had shot him, but had given no explanation of the circumstances, nor did he afterwards, and in a few hours he died.

*Dukes* was indicted for the murder of *White*.   On the trial, the state proved by Mrs. *Smith*, a sister-in-law of *Dukes*, who, on account of the absence from home, that night, of her husband, was lodging at the house of *Dukes*, and was sleeping in the same room in which *Dukes* slept, and from which he shot *White*, that immediately upon the discharge of the gun, she called to Mrs. *Dukes*, then in her husband's bed in the room, to light the candle which was standing by the head of her bed; that she at once did so, but that *Dukes* directed her to blow it out.   The defendant then asked the witness to state the reason assigned by *Dukes* for the extinguishment of the light; and also to state his appearance, manner, and condition of mind, as indicating alarm or otherwise, and the efforts made by him to sound an alarm to the public; but the Court refused to allow the witness to answer.   We think the question related to a part of the *res gesta,* and of one conversation touching the subject-matter, and should have been answered.

The defendant introduced, upon the trial, as a witness, *Andrew Dame*, who testified that there existed in the village of *Colfax*, the place where the homicide was committed, a secret society called the " *Good Templars;*" that the deceased, *White*, was a member of that society, and then proposed to prove by the witness that, in a meeting thereof, a short time before the attack upon *Dukes's* house,

in which *White* was shot, the latter had made threats against *Dukes*, and had said that *Sam. Dukes* should stop selling liquor or lose his life, or he, *White*, would lose his; but the Court would not allow the proof to be made.

It is a general proposition of law, "it is justly called the primary law of nature," that if a "party himself, or any of these his relations; [viz., husband and wife, parent and child, master and servant], be forcibly attacked in his person or property, it is lawful for him to repel force by force." "But care must be taken that the resistance does not exceed the bounds of mere defense and prevention." 3 Blacks. Comm. 3.

And when a party has assumed to act in the exercise of this right of self-defense, and is prosecuted therefor, we take it that it is competent for him to give in evidence any facts tending to show the character of the attack which he resisted, the intention with which it was made, and that he had reasonable grounds to believe that it was necessary, as a measure of prevention, to go to the extent he did in resisting it. 2 Wat. Archb. 225, *et seq*. That the threats proposed to be proved constituted such a fact, in this case, we cannot entertain a doubt. The circumstance that they were made at a meeting of a secret society, to the members thereof, instead of weakening, rather increased their force as evidence for the defendant. It tended to prove a secret conspiracy to sustain the threatened attack by numbers. The fact of such a conspiracy he had a right to inquire into, and if it existed, went far in justification of the act done.

For the errors already noticed the judgment must be reversed. We cannot say they may not have operated injuriously to the defendant.

Exceptions were taken to instructions. A very great number were given, and a great number refused. But it can scarcely be proper—it certainly is not necessary—that we should review them in this opinion. Instructions have reference to the evidence to which they are applicable. On another trial of this cause the evidence may make a case different from that to which the instructions upon the trial

had, applied.    And what has been said in discussing the questions upon the indictment, and the rulings upon the admission and rejection of evidence, will indicate the general principles which should govern instructions touching the act alleged to have been committed.

*Per Curiam.*—The judgment is reversed, and the clerk ordered to notify the keeper of the state prison to return. the defendant to the jail of *Clinton* county, to abide the further order of the Circuit Court.

*R. P. Davidson* and *L. McClurg*, for the appellant.

*J. W. Blake, J. F. Suit*, and *J. M. Cowen*, for the state.